COMMONWEALTH vs. RAYMOND HARMON.

Middlesex. April 2, 1991. - June 18, 1991.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Homicide. Constitutional Law*, Assistance of counsel, Evidence obtained by private party, State action. *Practice, Criminal*, Findings by judge, Voluntariness of statement, Motion to suppress, Recalling witness. *Witness*, Recalling.

Testimony at a first degree murder trial by a former fellow inmate of the defendant as to inculpatory statements made by the defendant while they were both incarcerated did not violate the defendant's State and Federal constitutional rights to counsel and was properly admitted as evidence, where there was nothing in the record to indicate that the inmate was functioning at that time as a government agent. [428-430]

In a first degree murder case, the judge's conclusion that the defendant's statements to the police on the night after the killing were not involuntarily made was amply supported by the evidence. [430-432]

There was no error in the denial of a murder defendant's motion to suppress his blood-stained dungarees, where the evidence demonstrated that the defendant gave oral consent to the police to obtain the dungarees and written consent authorizing police to test the dungarees for blood. [432]

The judge at a murder trial properly exercised his discretion to control the order of the evidence in refusing to allow defense counsel to recall certain prosecution witnesses, in circumstances where it was not shown that the request was based on new information that had become available only after the close of defense counsel's cross-examination. [432-434]

INDICTMENTS found and returned in the Superior Court Department on May 14, 1986.

A pretrial motion to suppress evidence was heard by *Robert S. Prince*, J., and the cases were tried before *John Paul Sullivan*, J.

*Stanley W. Norkunas* for the defendant.

*Michael Fabbri,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Raymond Harmon, was convicted of murder in the first degree and armed robbery in the beating death of Frederick Slavin. On appeal, the defendant claims that the trial judge erred (1) by admitting the testimony of a fellow prison inmate concerning inculpatory statements made by the defendant; (2) by failing to suppress the defendant's statements to police and certain physical evidence; and (3) by denying defense counsel's request to recall two State witnesses. We affirm. The defendant also asks that we exercise our power under G. L. c. 278, § 33E (1988 ed.), to reverse his conviction for murder in the first degree.[1] We conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, in the defendant's favor.

The jury could have found the facts as follows. Frederick Slavin, who was seventy-five years old at the time of his death, worked for a package store in Lowell. He stocked supplies and delivered goods to customers. Slavin also made a practice of cashing checks for friends and customers. It was thus not unusual for Slavin to be carrying several thousand dollars in cash as he made his deliveries. Slavin cashed checks for the defendant on at least two occasions. On the morning of November 14, 1985, the package store received a telephone order for a case of beer to be delivered to the rear door of 241 Pawtucket Street. Slavin left the package store shortly after 1 P.M., and stopped at a bank. He withdrew $8,000, and left the bank with the cash in a brown paper lunch bag. Shortly after 2 P.M., Slavin's body was discovered at the rear of 241 Pawtucket Street. His death was caused by several blows to the head. The paper bag containing $8,000 in cash lay near the body, but Slavin's front pant pockets had been turned inside out and were empty.

At 10:30 on that evening, the defendant was at the apartment of David Mullamphy with John Tarrant, Barbara Peas-

---

[1] The defendant makes no separate argument concerning his conviction for armed robbery.

lee, and Raymond Grenier. Police Inspector Durkin arrived at the apartment with three other police officers. Durkin knocked on the door, and the defendant admitted the officers. He had been drinking, but did not appear intoxicated. Durkin noticed a pair of dungarees draped over a washing machine in the kitchen. The dungarees were wet, and had a brown stain on one leg. The defendant indicated that the pants belonged to him. After a short time, Durkin asked the defendant if he was willing to go to the police station, and the defendant agreed to go. At one point, the defendant began staggering as he walked from the police car to the police station. Durkin told him to "knock it off," and the defendant walked normally the rest of the way to the police station. When they reached the police station, Harmon signed a card acknowledging that he had been given and understood the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Durkin then questioned the defendant about his movements during the day. Durkin asked if he could retrieve the wet dungarees from the apartment, and the defendant replied, "Go ahead." He signed a consent form authorizing the police to perform a chemical test on the pants. Testing later showed the stain to be blood of the same type as the victim's blood. The defendant signed a second "Miranda" card, and then gave a statement to Durkin. Durkin typed out the statement and the defendant signed it. The defendant left the police station early the next morning.

In May, 1986, the defendant was indicted for the murder of Slavin. At that time, he was serving a sentence at the Massachusetts Correctional Institution, Cedar Junction (Cedar Junction), on an unrelated charge. While at Cedar Junction, the defendant encountered a fellow inmate, Jose Otero, whom he had met during a previous incarceration. The two held several conversations, and the defendant told Otero that he had committed the murder. Otero took some notes on the information revealed by the defendant, and telephoned Durkin to tell him what he had learned. Otero testified for the Commonwealth at trial.

1. *Testimony of Jose Otero.* Before trial, the defendant moved to suppress Otero's testimony.[2] The motion was denied. On appeal, the defendant claims that admission of Otero's testimony as to their prison conversations violated his State and Federal rights to counsel.

A criminal defendant's right to be represented by counsel may be violated by "indirect and surreptitious" interrogations by government agents as well as overt interrogations by uniformed police officers. *Massiah* v. *United States,* 377 U.S. 201, 206 (1964). See *Commonwealth* v. *Rodwell,* 394 Mass. 694, 698-699 (1985). Where the government has entered into an arrangement with a prison inmate agreeing to pay him for incriminating evidence elicited from another inmate, an agency relationship may have been established. See *United States* v. *Henry,* 447 U.S. 264 (1980). However, an inmate who has not entered into any agreement with the government, and who reports incriminating evidence to police out of conscience or even "an unencouraged hope to curry favor" is not acting as a government agent. *Thomas* v. *Cox,* 708 F.2d 132, 136 (4th Cir.), cert. denied, 464 U.S. 918 (1983); *United States* v. *Watson,* 894 F.2d 1345, 1348 (D.C. Cir. 1990); *Lightbourne* v. *Dugger,* 829 F.2d 1012, 1021 (11th Cir. 1987), cert. denied, 488 U.S. 934 (1988); *United States* v. *Taylor,* 800 F.2d 1012, 1016 (10th Cir. 1986), cert. denied, 484 U.S. 838 (1987). See *Commonwealth* v. *Rodwell, supra* at 698-699. "An individual's actions will not be attributed to the State if no promises are made for that individual's help and if nothing was offered to or asked of that individual." *Commonwealth* v. *Rancourt,* 399 Mass. 269, 274 (1987).

At the suppression hearing, the judge heard testimony from Otero and Durkin, as well as from other witnesses. He issued written findings detailing the facts of the relationship between the defendant and Otero and Durkin. On appeal, we accept those findings of fact absent clear error. *Common-*

[2]The defendant filed a motion for a pretrial voir dire of Otero's testimony. By agreement, the motion was treated as a motion to suppress.

*wealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). However, we make an independent determination as to whether Otero was functioning as a government agent by applying constitutional principles to facts. See *Commonwealth* v. *Rancourt*, *supra* at 273-274; *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), S.C., 398 Mass. 806 (1986).

The judge's findings are as follows. Otero was in prison at the time of Slavin's murder. Durkin had arrested Otero on the charges that led to his sentence. Durkin also had arrested Otero on at least four other occasions during the previous four years. In May, 1986, Otero was transferred from Cedar Junction to the South Eastern Correctional Center (SECC), a medium security prison. From prison Otero called Durkin collect, two or three times a month. Otero had no visitors at SECC, and regarded Durkin as a "friend and advisor." Durkin kept Otero informed about Otero's brothers and sisters in Lowell. Otero was transferred from SECC back to Cedar Junction because of disciplinary infractions. Otero began working as a cook in the kitchen at Cedar Junction. There he encountered the defendant, an acquaintance from a previous incarceration in Billerica, who was also working in the kitchen. During one of his telephone calls to Durkin, Otero mentioned that he was working with "the guy who killed the old man." Durkin told him to "keep his ears open." After the defendant told Otero about the murder, Otero began to keep notes of his conversations with the defendant. In mid-October, the defendant told Otero that he had killed Slavin by beating him, and by hitting Slavin's head against a rock. Two days later Otero telephoned Durkin and told him that the defendant had revealed the details of the murder. Durkin responded that such knowledge was of no use to him unless Otero was willing to testify to it. Otero said that he needed to think it over. The next day Otero called back and told Durkin that he was willing to testify. Durkin arranged meetings with police and an assistant district attorney to take Otero's statement and retrieve Otero's notes. Immediately after meeting with police, Otero was placed in segregation for his own protection.

Otero testified that Slavin had cashed checks for him, and that "the old man didn't deserve what [the defendant] had done to him." He denied having been offered any promises, inducements, or rewards for his testimony. The assistant district attorney stated that he told Otero that he would request that Otero's parole board hearing be moved up from mid-December to late November.

The facts found by the judge are supported by the evidence at the suppression hearing and at trial. Nothing in these facts lends credence to the defendant's conclusion that Otero was functioning as a government agent. Nothing in the record indicates that Durkin or other officials entered into any agreement with Otero. No money or benefit was promised to Otero, expressly or implicitly, as an inducement or reward for information about the defendant. The only action that can be attributed to the government is Durkin's suggestion that Otero "keep his ears open." Such a suggestion, especially when offered after Otero already had come forward with information, does not suffice to establish an agency relationship. See *Lightbourne* v. *Dugger, supra; Commonwealth* v. *Rancourt, supra.* We conclude, therefore, that Otero was not functioning as a government agent when he spoke with the defendant in prison. The defendant's right to counsel was not violated.[3]

2. *The defendant's statements to police.* After a hearing, the judge denied the defendant's pretrial motion to suppress the statements he made to police on the night after the killing. The judge adopted the "Statement of Facts" from the Commonwealth's memorandum of law on the motion as his findings of fact. Although we do not recommend this practice, its use does not change our standard of review. *Commonwealth* v. *DeMinico,* 408 Mass. 230, 238 (1990). "In reviewing the denial of a motion to suppress, we accept the

---

[3]The defendant does not argue, nor does anything in the record suggest, that his statements to Otero were coerced. Therefore, we have no occasion to consider whether we will follow *Arizona* v. *Fulminante,* 111 S.Ct. 1246 (1991).

motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman, supra* at 743.

The facts as adopted by the judge indicate that, on the night when the defendant made the statements to police, he had been drinking, but was not drunk. He consented to accompany the police officers to the station. He appeared to be aware and in control of himself. At one point, he began stumbling as he walked, and, at other points, he appeared to lose his concentration, but he resumed normal behavior when requested to do so. Police informed him twice of the warnings required by *Miranda* v. *Arizona, supra,* on his arrival at the station and again before taking a written statement. On both occasions, the defendant stated that he understood his constitutional rights, and signed a card waiving those rights. The defendant orally consented to the police obtaining his dungarees. Before the police tested the dungarees for blood, they obtained a written consent from the defendant for the blood testing.

On appeal, the defendant suggests that a number of factors combined to render the defendant's statements involuntary. He points to the number of police officers who arrived at the apartment, and the fact that police observed him staggering and losing concentration. He notes that John Tarrant, who was present at the apartment when the police arrived, testified at the suppression hearing that the defendant had been taken forcibly from the apartment, and appeared the next day with a black eye and facial scratches.

After reviewing the evidence, we conclude that the judge did not err in denying the defendant's motion to suppress his statements. Durkin, who was named in the defendant's affidavit accompanying the motion to suppress as the officer who allegedly struck him, testified at the hearing that he did not strike the defendant. Durkin's testimony was supported by State police officer Joseph Flaherty. "The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court." *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980). " 'Where there has been conflicting

testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted.' *Commonwealth* v. *Spagnolo*, 17 Mass. App. Ct. 516, 517-518 (1984)." *Commonwealth* v. *Yesilciman, supra* at 743. The judge's ruling shows that he believed the officers' testimony that the defendant was not intoxicated, had not been struck, and was not coerced into making statements by physical force. His conclusions are amply supported by the evidence.

3. *The defendant's dungarees.* The defendant made a pretrial motion to suppress his blood-stained dungarees which were found in the apartment. The judge denied the motion. On appeal, he simply states that it is "interesting" that, at the suppression hearing, the police did not produce the written consent form authorizing them to obtain the dungarees from the apartment. This is hardly surprising, because Durkin testified at the suppression hearing that he sought and obtained oral consent from the defendant to obtain the dungarees. The defendant signed a consent form authorizing police to test the dungarees for blood, and that form was introduced in evidence at the suppression hearing. There is no basis on this record to suppress the dungarees.

4. *Recall of the witnesses.* After the Commonwealth rested its case, defense counsel indicated that he intended to recall as defense witnesses Durkin and Tousignant. Both officers had testified for the prosecution, and had been cross-examined. Defense counsel explained to the judge that he had chosen not to pursue certain lines of questioning on cross-examination for strategic reasons, and that he wanted to pursue those lines of inquiry on direct examination. The judge initially refused to allow the defendant to recall the two officers, but later did allow Tousignant to be recalled and questioned on one issue. The defendant contends on appeal that his State and Federal constitutional rights to a fair trial were violated when the judge denied the defendant's request to recall the officers.

"In the trial of cases much must be left to the discretion of the presiding judge as to the order in which the evidence is to

be introduced." *Commonwealth* v. *Whooley*, 362 Mass. 313, 318 (1972). "Whether or not a witness should be recalled in a criminal case is a matter entrusted to the sound discretion of the trial judge." *Commonwealth* v. *Hicks*, 375 Mass. 274, 276 (1978). See *Commonwealth* v. *Shaw*, 29 Mass. App. Ct. 39, 42 (1990).

The judge in the present case made it clear from the beginning of the trial that he would exercise his discretion to order the testimony of the witnesses. At a bench conference during the examination of the first witness in the present case, the judge informed both counsel that ordinarily he would limit the examination of witnesses to direct, cross-, and redirect examination. He indicated that he would alter this general rule where new matters arose during cross- or redirect examination. Early in the trial, defense counsel explicitly stated that he understood the judge's policy on recross-examination. During the examination of two prosecution witnesses, he requested an opportunity for recross-examination because new matters had arisen during redirect examination, and the judge allowed him the opportunity to pose further questions.

Defense counsel had a full opportunity to cross-examine both Durkin and Tousignant. He did not indicate to the judge that he wished to reserve some questions for a later time, nor did he list the officers as witnesses he intended to call. Defense counsel had a very precise expectation as to how the witnesses would respond to his proposed questions. His reasons for wishing to pursue certain lines of inquiry on recall rather than on cross-examination were based on his desire to control the order of their testimony, and not on any new information which became available after he finished his cross-examination. The judge carefully inquired as to defense counsel's reasons for wishing to recall the witnesses, and determined that no new information had been discovered after the close of defense counsel's cross-examination. Defense counsel claimed that he needed to recall Durkin in order to explore the relationship between Durkin and Otero as revealed in the pattern of telephone calls from Otero to Dur-

kin. The judge noted that defense counsel had demonstrated at a pretrial motion argument that he knew of the telephone calls and understood their significance. Defense counsel had ample opportunity to use this information at trial by cross-examination of both Durkin and Otero. Despite his knowledge and the opportunity, defense counsel chose not to question Durkin about the telephone calls from Otero. However, during his cross-examination of Otero, defense counsel did explore the subject of the telephone calls from Otero to Durkin. The judge denied the request to recall the witnesses because he concluded that to do so would permit the defense to "highlight" particular portions of the officers' testimony by separating such portions from the bulk of their testimony. In these circumstances, the judge did not abuse his discretion in refusing to allow defense counsel to recall the witnesses. See *Commonwealth* v. *Hicks, supra* at 276-277; *Commonwealth* v. *Appleby*, 389 Mass. 359, 378, cert. denied, 464 U.S. 941 (1983); *Lowenfield* v. *Phelps*, 817 F.2d 285 (5th Cir.), cert. granted in part, 483 U.S. 1005, aff'd, 484 U.S. 231 (1987).

5. *Relief pursuant to G. L. c. 278, § 33E.* Pursuant to G. L. c. 278, § 33E, we have reviewed the full record of the conviction for murder in the first degree, and conclude that there is no reason for us to enter a verdict of a lesser degree of guilt or to order a new trial.

*Judgments affirmed.*