## Commonwealth *vs*. Frederick Murphy.

Hampden. September 8, 2006. - March 6, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Constitutional Law,* Assistance of counsel, Conduct of government agents. *Due Process of Law,* Assistance of counsel, Extrajudicial statement. *Practice, Criminal,* Assistance of counsel, Conduct of government agents.

This court concluded that where the government entered into an articulated agreement with an inmate to act as an informant, which agreement contained a specific benefit or promise thereof, the recipient inmate was a government agent for purposes of the Sixth Amendment to the United States Constitution [456-465] and art. 12 of the Massachusetts Declaration of Rights [465-468], even if the inmate was not directed to target a specific individual.

In a criminal trial, admission in evidence of the defendant's statements made to a jailhouse informant acting as a government agent violated the defendant's right to counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, where the informant deliberately elicited the statements from the defendant. [468-471]

Indictments found and returned in the Superior Court Department on July 1, 1998.

The cases were tried before *Thomas J. Curley, Jr.,* J., and motions for a new trial and for posttrial discovery, filed on October 28, 2002, were heard by him.

*John M. Thompson* for the defendant.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

*Donald A. Harwood,* for Committee for Public Counsel Services, amicus curiae, submitted a brief.

Ireland, J. In May, 1999, a jury convicted the defendant, Frederick Murphy, of murder in the first degree on the theory of deliberate premeditation; assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A [*b*]); unlawful possession of a firearm (G. L. c. 269, § 10 [*a*]); and unlawful possession

of a firearm or ammunition without a firearms identification card (G. L. c. 269, § 10 [*h*]). The defendant appealed. He also filed a posttrial motion for discovery, which was granted in part by the trial judge, and an amended motion for a new trial, which the judge denied. As he did in his amended motion for a new trial, on appeal, he asserts, inter alia, that his right to counsel was violated by the admission of postindictment statements he made to a jailhouse informant who had signed a cooperation agreement with the United States Attorney's office. We conclude that, where the government has entered into an "articulated agreement containing a specific benefit," or promise thereof, *Commonwealth* v. *Reynolds*, 429 Mass. 388, 394 & n.7 (1999), the recipient inmate is a government agent for purposes of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights even if the inmate is not directed to target a specific individual. Because we conclude that the defendant's right to counsel under the Sixth Amendment and art. 12 was violated by the admission of the defendant's postindictment statements to a jailhouse informant who deliberately elicited the statement, and that the Commonwealth has not shown that the statement was harmless beyond a reasonable doubt, the defendant is entitled to a new trial.

*Background and procedure.* We set forth the background facts from the trial transcript and the record, reserving details for our discussion.

At trial, the evidence against the defendant came from the testimony of an eyewitness and a jailhouse informant. The Commonwealth's theory of the motive for the murder was retribution: the defendant was angry that the victim was making payments (for drugs) to a Jamaican named Derrick Riley, nicknamed "Randy." It was purported that Riley was a member of a gang known as the 90's Posse.

Just after midnight on August 2, 1993, the victim was shot three times while walking from a friend's home toward his own home, both of which were located on Andrew Street in Springfield. Paul Smith, an illegal immigrant from Jamaica, was the only eyewitness. Smith testified that it was about 11:45 P.M. on August 1 when he met the victim at the friend's house;

earlier that evening, he and the victim had made plans to go to a night club.

Smith testified that he took a taxicab from his home to Andrew Street, but had the driver drop him off down the street from the friend's house. As he was walking up Andrew Street to meet the victim, he saw a "kid" in the driveway at 91 Andrew Street. He thought it was someone named Bernard and greeted him. Smith received no response and testified that he continued walking up Andrew Street to meet the victim.

At some point after Smith arrived at the friend's house, Smith and the victim started walking toward the victim's home. Smith was walking about three feet behind the victim but trying to catch up. A man wearing black pants and a black hooded sweatshirt emerged from the driveway at 91 Andrew Street holding a black revolver. Smith started running as the man chased the victim and fired shots. Smith looked back and saw the victim fall.

The victim's girl friend ran out of her home when she heard shots. As Smith was running past her, he told her that the victim was shot but did not identify the shooter, even though Smith testified at trial that he saw the defendant's face and that he and the girl friend both knew the defendant. At trial, the defendant's girl friend testified that when she saw the defendant in the early morning hours of August 2, he was wearing black pants and a black see-through shirt with gold speckles.

Smith kept running and did not return to the scene even though he saw the police arriving. Instead, he returned to his home, slept, and, later that day, went to New York City. He testified that he had relatives in Brooklyn and wanted to talk to them because he was frightened. Smith's relatives were not at home when he arrived and Smith testified that he discussed his situation with "a person that I know" from Jamaica. Smith told this person that it was the defendant who had killed the victim. He testified that the man told Smith that he needed to go back to Springfield and tell the police. Smith returned to Springfield, learned that the police were looking for him, and on August 3, gave police a statement identifying the defendant as the shooter.

Smith testified over two days. When the court recessed after the first day of Smith's testimony, the prosecutor had Smith in

her office. She asked Smith to whom he had spoken in New York. The prosecutor learned for the first time that the individual was the alleged gang member, Derrick Riley.[1]

The only other evidence of the defendant's involvement in the murder was the testimony of a jailhouse informant, who had a plea agreement with the United States Attorney's office, part of which could affect his sentence on Federal charges. After a voir dire of the informant, discussed *infra*, the judge rejected the defendant's argument that the informant should not be allowed to testify concerning statements the defendant had made to him. The informant testified that while being held in the Hampden County jail awaiting sentencing, he met the defendant. The defendant had been indicted and was represented by counsel at the time.

The informant testified that, after he had entered into the agreement with the United States Attorney's office, he did the defendant a favor. The defendant then started to converse with him more.[2] From their conversations,[3] the defendant learned that the informant's girl friend and Smith's girl friend were cousins. The defendant asked the informant to contact Smith through the girl friends and offer him fifty pounds of "weed" in exchange for not testifying. The informant did so and reported back to the defendant that Smith refused and was afraid.

The defendant then started talking to the informant about the victim, whom the defendant called his godson. The informant testified that the defendant stated that he and Riley had been in a gunfight in New York; that Riley "was making all of the Jamaican guys work for him or pay him . . . money"; and that one of the people paying money to Riley was the victim. The

---

[1]The prosecutor immediately informed defense counsel and informed the court the next day. There was a voir dire of Smith and defense counsel incorporated this information into his cross-examination of Smith as well as in his questioning of the investigating police officers.

During his voir dire, Smith stated that Riley already knew that the victim had been killed, but did not know the identity of the shooter.

[2]The details of the "favor" that was the catalyst for the conversations he then had with the defendant were kept from the jury. The defendant passed off a "shank" to the informant, who then hid it from a correction officer.

[3]The judge found that all of the defendant's incriminating statements were made after the informant had made his agreement with the United States Attorney's office.

informant stated that the defendant claimed to be angry with the victim, so the defendant "licked" him.

On two occasions during his testimony, the prosecutor elicited from the informant that he had an agreement with the Federal authorities but that he had no deal with the Commonwealth.

At trial, the defense claimed that the informant was lying so that he could be rewarded with a lighter sentence; that Smith was lying and either guilty himself or guilty of setting the victim up for Riley; that Smith was rewarded by the Commonwealth for his testimony when he was facing prosecution for unrelated crimes that occurred after the murder, but before the trial; and that there were other, related shootings in the nights leading up to this murder. The defense theory was that the victim had participated with others in breaking into the home of someone who worked for Riley and robbing the occupants and that all the shootings, including the victim's, were retaliation. As the victims of the robbery had never reported the crime and one of the alleged participants invoked his right not to testify pursuant to the Fifth Amendment to the United States Constitution, the judge restricted the admission of this evidence to Smith's state of mind. In addition, the defense alleged an inadequate police investigation. The defense pointed out that, although the investigation never closed, once police obtained the defendant's name from Smith, they did not fully follow up on other leads.[4]

In his instructions to the jury, the judge told them that the evidence that the defendant tried to influence a witness could be used as evidence of consciousness of guilt.

*Discussion. 1. Government agent under the Sixth Amendment.* As noted, the defendant tried to have his statements to the informant suppressed. After a voir dire of the informant, the judge stated that although there was an agreement with the Federal government, there was no agency relationship with the

---

[4]For example, two residents of Andrew Street who came out to see what had happened right after the shooting told police that a car stopped by the victim and that the driver got out of the car and took money from the victim. The residents gave police, who arrived within minutes of the shooting, the registration number of the vehicle. A police officer testified that he did not know how that lead was followed up in part because the police determined that it happened after the shooting and therefore was unrelated.

Federal government and there was no evidence that the informant deliberately elicited information from the defendant. The defendant renewed his motion to suppress at trial, but it was denied.

He raised the issue again, with new evidence, in his amended motion for a new trial, which the judge denied. In his memorandum of decision, the judge relied on *United States* v. *LaBare*, 191 F.3d 60, 65, 66 (1st Cir. 1999), discussed *infra*, to conclude that there was no Sixth Amendment concern. He also stated that, in any event, there was no evidence that the informant deliberately elicited the statements from the defendant.

The defendant argues that the admission of the informant's testimony violated his right to counsel under either the Sixth Amendment or art. 12.[5] We agree.[6]

In October, 1998, the informant, a convicted felon, signed an agreement with the United States Attorney's office whereby he would plead guilty to thirty-five counts of a fifty-count indictment involving the informant's using a third party to purchase thirty-one firearms for him, which he then sold. The informant did not agree to a plea agreement until his codefendant had agreed to testify against him.

One of the terms of the agreement was that if the informant provided "substantial assistance" to the government, in the discretion of the United States Attorney's office, a motion could be filed so that the sentencing judge could "impose a sentence below that which otherwise would be required under the Sentencing Guidelines." At the hearing where the informant pleaded guilty, the assistant United States attorney stated, "[The informant] has asked that he be able to cooperate in the course

[5]After oral argument, we requested supplemental briefs on the question of the scope of the protection afforded a defendant under art. 12 of the Massachusetts Declaration of Rights in the exact circumstances of this case. Both parties submitted supplemental briefs. We also acknowledge the amicus brief of the Committee for Public Counsel Services.

[6]Except where relevant, our discussion of additional facts does not differentiate between evidence available to the judge at trial and evidence obtained through posttrial discovery conducted pursuant to the defendant's motions for a new trial and discovery and considered by the judge in denying the defendant's amended motion for a new trial.

of other investigations. We don't know where that is going to go. He hasn't begun that cooperation yet."[7] In accepting the informant's guilty pleas, the judge stated, inter alia, "Any cooperation brought forward by [the informant] will be considered if the United States attorney so moves." The informant claimed during his voir dire that he was never asked directly by any law enforcement officer to engage in conversation with the defendant.

At some point after the defendant made his statement about "licking" the victim, the informant contacted his attorney and in March, 1999, the informant gave his statement to police. The informant's statement, which was in writing, said, in part, "There haven't been any promises made to me for my testimony or this statement. I have been told that the U.S. Attorney's office would be made aware of my co-operation."

In his written statement, the informant said that after the defendant told him that he was upset with the victim over his dealings with Riley, "I asked [the defendant] what he did about that and he told me that he 'licked [the victim].' " His written statement also stated that the informant was "shocked that [the defendant] was telling me this shit but I wasn't totally surprised by it . . . [because the defendant] had a reputation on the streets as a shooter. He was always threatening people in jail that if this was the streets he would shoot them."

Despite the informant's written statement to the contrary, during the voir dire concerning whether the informant would be allowed to testify at trial, the prosecutor told the judge that the informant had no deal with her and that she was "not in a position to reward him." In addition, as discussed *supra*, at trial she elicited statements from the informant that he had no deal with her. This information was incorrect. Documents obtained through posttrial discovery showed that the Commonwealth did, in fact, inform the United States Attorney's office of the informant's cooperation.[8] The United States Attorney's office

---

[7]The record shows that although the informant pleaded guilty in October, 1998, and his case was scheduled for disposition in January, 1999, the informant was not actually sentenced until January, 2000, after the defendant's trial. There is nothing in the record explaining the delay.

[8]At oral argument the Commonwealth conceded that this was an error that the prosecutor should have corrected. *Napue* v. *Illinois*, 360 U.S. 264, 269-270 (1959).

subsequently filed a motion to reduce the informant's sentence by fifty per cent.

In denying the defendant's amended motion for a new trial, the judge stated that even if the informant were an agent for the Federal government and such agency could be imputed to the Commonwealth, his conclusion was that the informant did not deliberately elicit the information from the defendant. Because neither the Commonwealth nor defense counsel raised the issue at the voir dire of the informant, the judge relied on the truth of the informant's written statement to the police that he specifically asked the defendant what he did about the victim to elicit the response that he "licked" him. The judge also relied on the informant's written statement that he was "shocked" at the response as evidence that the defendant's answer was not deliberately elicited.

The judge also concluded that, although the prosecutor did promise the informant that the United States Attorney's office would be made aware of his cooperation, the prosecutor's stating that she could not reward the defendant and eliciting equally false statements from the defendant did not require a new trial. The judge pointed to the fact that defense counsel knew from the informant's statement to police that there was a deal with the Commonwealth and that the jury heard the essential fact: there was a deal. Defense counsel, the judge concluded, focused much of his cross-examination on the informant's motive to testify.

"[W]e make an independent determination as to whether [an informant] was functioning as a government agent by applying constitutional principles to facts." *Commonwealth* v. *Harmon*, 410 Mass. 425, 429 (1991). The court accepts the findings of fact from a suppression hearing absent clear error. *Id*. at 428.

In this case, the defendant had been indicted in July, 1998. Thus, his Sixth Amendment right to counsel had attached at the time he made his statements to the informant. *Commonwealth* v. *Torres*, 442 Mass. 554, 570 (2004), quoting *Fellers* v. *United States*, 540 U.S. 519, 523 (1977). Under the Sixth Amendment, if the government uses an agent deliberately to elicit statements from a defendant absent his counsel, those statements must be suppressed. *Commonwealth* v. *Reynolds*, 429 Mass. 388, 393

(1999), citing *Massiah* v. *United States*, 377 U.S. 201, 206 (1964), *Maine* v. *Moulton*, 474 U.S. 159, 172-176 (1985), and *Commonwealth* v. *Harmon*, *supra* at 428.

The United States Supreme Court has not clearly defined the point at which agency arises. Agency was not a contested issue in *Kuhlmann* v. *Wilson*, 477 U.S. 436, 439 (1986) (police deliberately placed informant in cell with defendant); *Maine* v. *Moulton*, *supra* at 164-165 (codefendant wore wire transmitter); or *Massiah* v. *United States*, *supra* at 202-203 (codefendant allowed Federal customs agents to install transmitter in car and to listen to conversations with defendant). However, in *United States* v. *Henry*, 447 U.S. 264, 266, 270-271 (1980), the Court held that a jailhouse informant paid on a contingent fee basis was acting as an agent for the government. See *United States* v. *LaBare*, 191 F.3d 60, 65 (1st Cir. 1999) (circuits of United States Court of Appeals divided concerning agency because *Massiah* lacked precise formula and later cases "waver in their emphases").

In *Commonwealth* v. *Reynolds*, *supra* at 393-394, the Commonwealth promised "to bring the witness's cooperation to the attention of prosecutors and the court, if and when requested." The court held that where there is an "articulated agreement containing a specific benefit," an agency relationship has been established. *Id.* at 394. Moreover, just the promise of recognition of cooperation is sufficient to establish an agency relationship. *Id.* at 394 n.7. The court supported its conclusion in part by reference to *Commonwealth* v. *Harmon*, *supra*, which cited *United States* v. *Henry*, *supra*.

A few months after the *Reynolds* case was released, the United States Court of Appeals for the First Circuit issued its *LaBare* opinion, in which it stated that a cooperation agreement that does not target a particular defendant does not trigger "a successful *Massiah* objection to information collected" by a jailhouse informant. *United States* v. *LaBare*, *supra* at 65. There, in March, 1997, the informant entered into a general cooperation agreement with the Federal government promising to disclose "all that he knows or has heard about violations of federal and state law." *Id.* at 64. The informant was told not to question other inmates; he also was told he was not a govern-

ment agent. *Id.* Also beginning in March, 1997, the defendant and the informant began talking, and the informant contacted an assistant United States attorney to report what he learned. *Id.* Once the informant met with an assistant United States attorney, on April 11, 1997, the government then focused the informant's attention on the defendant, but by then, all of the incriminating information had been revealed. *Id.* at 64-65.

The court acknowledged that there was a split among circuits of the United States Court of Appeals whether a defendant needs to be specifically targeted in order to trigger a *Massiah* concern. *Id.* at 65 & n.2, comparing *Moore* v. *United States*, 178 F.3d 994 (8th Cir.), cert. denied, 528 U.S. 943 (1999), and *United States* v. *Birbal*, 113 F.3d 342 (2d Cir.), cert. denied, 522 U.S. 976 (1997), with *United States* v. *Brink*, 39 F.3d 419 (3d Cir. 1994), and *Creel* v. *Johnson*, 162 F.3d 385 (5th Cir. 1998), cert. denied, 526 U.S. 1148 (1999).

However, the court stated, "Where the government asks a jail mate to report incriminating statements by anyone but has in no way focused . . . attention on an individual defendant, it is a stretch to describe the jail mate's inquiries of the defendant as 'government interrogation.' " *United States* v. *LaBare, supra* at 65. The court stated that one reason it was rejecting the approach of the Third and Fifth Circuits, which use targeting of an individual defendant as "merely" one factor in making a determination whether *Massiah* was triggered, was because it was not a clear rule that law enforcement could follow. *Id.* at 65. Nevertheless, at the conclusion of its discussion concerning agreements that do not target individuals, the court stated, "This may be a close call as to [the informant], given conflicting precedent." *Id.* at 66. The court then relied on other witnesses and evidence to conclude that the admission of the informant's testimony was harmless. *Id.*

Although it is not apparent from the decision in the *Reynolds* case, the court's discussion of agency occurred in the context of a targeted individual and without the benefit of the analysis of the *LaBare* case. The judge had denied the defendant's motion to suppress his statements to the informant and his request for an evidentiary hearing. *Commonwealth* v. *Reynolds, supra* at 392. Because there were no findings of fact below, the court

remanded the case for a determination of when the agency relationship was formed and whether the information to which the informant testified was obtained after he became an agent of the Commonwealth. *Id.* at 394-395.

The situation here, where the defendant was not individually targeted, presents us the opportunity to consider the issue in light of *United States* v. *LaBare, supra.* Although we are not bound by any decision of any Federal court other than the United States Supreme Court concerning Federal law, we give great deference to decisions of Federal courts if they seem persuasive. *Commonwealth* v. *Hill*, 377 Mass. 59, 61 (1979). We conclude that there is nothing in Supreme Court precedent that mandates targeting as determinative of a person's status as a government agent.[9]

In the *LaBare* case, the First Circuit stated that it was persuaded by reasoning of the Second and Eighth Circuits that one is not an agent of the government unless a particular defendant is targeted. In *United States* v. *Birbal, supra* at 346, the Second Circuit stated, "Other circuits agree that an informant becomes a government agent for purposes of *Kuhlmann* only when the informant has been instructed . . . about the particular defendant."[10] It is true that in the *Kuhlmann* case, the informant targeted the defendant, but as discussed *supra*, agency was not a contested issue in the case. Instead, the *Kuhlmann* case was concerned with addressing a question that was left open by the Court's decision in *United States* v. *Henry*, 447 U.S. 264 (1980), "whether the Sixth Amendment forbids admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversation about the crime charged.' " *Kuhlmann* v. *Wilson, supra* at 456, quoting *United States* v. *Henry, supra* at 271 n.9. The Court stated that "a defendant does not

---

[9]We do not conclude that targeting may never be used as a factor in determining whether someone is a government agent.

[10]In *Moore* v. *United States*, 178 F.3d 994, 999 (8th Cir.), cert. denied, 528 U.S. 943 (1999), the court simply quotes the reference to *Kuhlmann* v. *Wilson*, 477 U.S. 436 (1986), in *United States* v. *Birbal*, 113 F.3d 342 (2d Cir.), cert. denied, 522 U.S. 976 (1997), to support its assertion that the *Massiah* case requires that a defendant be targeted.

make out a *violation of that [Sixth Amendment] right* simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (Emphasis added.) *Kuhlmann* v. *Wilson, supra* at 459. The Court then went on to discuss whether the informant *deliberately elicited* the defendant's incriminating statements. *Id.* at 460-461. Thus, although the *Kuhlmann* case supports the idea that in order for a violation of the Sixth Amendment to occur, a defendant's statement must be deliberately elicited, there is nothing in the decision that states that a defendant must be targeted for agency to attach. See *United States* v. *York*, 933 F.2d 1343, 1356 (7th Cir.), cert. denied, 502 U.S. 916 (1991), rev'd on other grounds, *Wilson* v. *Williams*, 182 F.3d 562 (7th Cir. 1999); Note, Government Responsibility for the Acts of Jailhouse Informants Under the Sixth Amendment, 101 Mich. L. Rev. 2525, 2535-2536 (2003) (discussing interpretations of *Kuhlmann* case); Tomkovicz, An Adversary System Defense of the Right to Counsel Against Informants: Truth, Fair Play, and the Massiah Doctrine, 22 U.C. Davis L. Rev. 1, 15-20 (1998) (positing that *Massiah* line of cases set up two-prong inquiry for Sixth Amendment violation: agency and deliberate elicitation).

Moreover, in the *LaBare* case, the First Circuit did not discuss what benefit the informant received for his promise to reveal everything he heard. In addition, despite its holding, the court called the case a "close call . . . , given conflicting precedent," and proceeded to analyze other evidence against the defendant to determine that the inclusion of the informant's testimony was harmless. *United States* v. *LaBare*, 191 F.3d 60, 66 (1st Cir. 1999).

Given that nothing in any United States Supreme Court case requires targeting of a defendant for agency to attach, the First Circuit's concern that its case was a close call, and the split among the Federal circuits, we conclude that the holding in the *Reynolds* case, that "an articulated agreement containing a

specific benefit" creates an agency relationship, is still valid.[11] *Commonwealth* v. *Reynolds*, 429 Mass. 388, 394 (1999). See *Manns* v. *State*, 122 S.W.3d 171, 178-188 (Tex. Ct. Crim. App. 2003) (reviewing various interpretations of United States Supreme Court precedent). Our conclusion is consistent with the United States Supreme Court's statement that the "Sixth Amendment . . . imposes on the State an *affirmative obligation* to respect and preserve the accused's choice to seek . . . assistance [of counsel]. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an *affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel*" (emphasis added). *Maine* v. *Moulton*, 474 U.S. 159, 171 (1985).

Indeed, a bright line rule that requires targeting a specific defendant no matter what the agreement between the informant and the government would allow the government to circumvent its affirmative obligation to protect rights of the accused by creating what one court has called an "informant at large." *United States* v. *Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980). See Note, Government Responsibility for the Acts of Jailhouse Informants Under the Sixth Amendment, *supra* at 2532-2538. In the *Sampol* case, the informant was awaiting sentencing. *United States* v. *Sampol*, *supra* at 631. His freedom was contingent on his "full cooperation with all the authorities, federal and state, anywhere in the United States." *Id.* at 638. The court found that the principles articulated in *United States* v. *Henry*, 447 U.S. 254 (1980), applied and observed that the "government trolled in the jail, using [the informant] as bait, and was ready to net any unwary inmate who rose to the lure." *United States* v. *Sampol*, *supra* at 637-638. See *Commonwealth* v. *Moose*, 529 Pa. 218, 229 (1992) ("The fact that the Commonwealth intentionally left [the informant] there to harvest information from anyone charged with a crime and awaiting trial is the villainy").

[11]Nothing in our decisions in *Commonwealth* v. *Howard*, 446 Mass. 563, 568-569 (2006), and *Commonwealth* v. *Hilton*, 443 Mass. 597, 614-615 (2005), which cite *United States* v. *LaBare*, 191 F.3d 60 (1st Cir. 1999), as support for other issues, is inconsistent with our conclusion today.

In this case there was a specific agreement promising that the assistant United States attorney would file a motion to allow a judge to reduce the informant's sentence if he gave "substantial assistance" to the government. The assistant United States attorney stated at the hearing where the informant pleaded guilty that he did not know what form the informant's cooperation would take, and the judge stated that any cooperation would be taken into consideration if the United States Attorney's office so moved. The informant testified at his voir dire that he interpreted cooperation to mean "find out information . . . and help get somebody convicted." The informant was a government agent. *Commonwealth* v. *Reynolds*, *supra* at 394. Although the informant's agreement was with the United States Attorney's office, the Commonwealth may not use information obtained by unlawful police conduct. *Nix* v. *Williams*, 467 U.S. 431, 441-442 (1984), citing *United States* v. *Wade*, 388 U.S. 218 (1967) (discussing application of "fruit of poisonous tree doctrine" to Sixth Amendment right to counsel).

2. *Government agent under art. 12.* Even if our interpretation of the defendant's rights under the *Massiah* line of cases is overbroad, we nevertheless conclude that art. 12 protects the right to counsel in these circumstances.

In deciding whether art. 12 offers more protection of the right to counsel than the Sixth Amendment, "our guiding consideration is whether the Federal rule adequately protects the rights of the citizens of Massachusetts." *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 858 (2000) (art. 12 provides more protection than Fifth Amendment). This court looks "to the text, history, and our prior interpretations of art. 12, as well as the jurisprudence existing in the Commonwealth." *Id.*

Article 12 provides that "every subject shall have a right to . . . be fully heard in his defence by himself, or his counsel, at his election." "We have long interpreted that text generously to recognize the 'fundamental . . . right of a person accused of a serious crime to have the aid and advice of counsel.' " *Commonwealth* v. *Rainwater*, 425 Mass. 540, 553 (1997), cert. denied, 522 U.S. 1095 (1998), quoting *Guerin* v. *Commonwealth*, 339 Mass. 731, 734 (1959). "[T]he essential element of fairness in the administration of justice depends" on the right to counsel. *Guerin* v. *Commonwealth*, *supra* at 734.

We have elsewhere described in detail the instances where this court has interpreted the art. 12 right to counsel more expansively than the Sixth Amendment, including granting indigent defendants the right to appointment of counsel years before the United States Supreme Court recognized such rights and relieving the defendant of a burden to prove actual prejudice required by the Sixth Amendment where an attorney has an actual conflict of interest. *Commonwealth* v. *Rainwater, supra* at 553-554, and cases cited. More recently, in *Lavallee* v. *Justices in the Hampden Superior Court*, 442 Mass. 228, 230-231 (2004), this court concluded that indigent defendants being held in lieu of bail were being deprived of their right to counsel under art. 12 where, because of the low rate of compensation being offered, the State was unable to enlist private attorneys for representation, and attorneys in the public defender division of the Committee for Public Counsel Services (CPCS) were unavailable. The court rejected the argument that the mere assignment of a defendant's case to CPCS for eventual appointment of an attorney was an adequate protection of the right to counsel. *Id.* at 234. The court stated that the right to counsel meant the right to *effective* assistance of counsel. *Id.* at 235, citing *Kimmelman* v. *Morrison*, 477 U.S. 365, 377 (1986). Accord *Commonwealth* v. *Mavredakis, supra* at 860 ("duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize" or give substantive meaning to Miranda rights).

In that vein, this court has safeguarded the attorney-client relationship. In *Commonwealth* v. *Manning*, 373 Mass. 438, 440, 443 (1977), the court found a Sixth Amendment violation where a drug enforcement agent contacted the defendant without his counsel's knowledge, disparaged the defendant's counsel, and urged the defendant to become an informant "in a calculated attempt to coerce the defendant into abandoning his defense." The court concluded that the action was so egregious that the indictment had to be dismissed. *Id.* at 444-445. In *Moran* v. *Burbine*, 475 U.S. 412, 422, 432 (1986), the United States Supreme Court held that under the Fifth and Sixth Amendments, the police had no duty to inform a suspect of his attorney's efforts to render assistance where that suspect had not personally requested legal representation, but this court

concluded that art. 12 imposed such a duty on police in order to give substantive meaning to a suspect's Miranda rights. *Commonwealth* v. *Mavredakis, supra.*

In two recent cases, this court has given substantive meaning to the prohibition, under the Sixth Amendment, against any "knowing exploitation by the State of an opportunity to confront the accused without counsel being present," *Maine* v. *Moulton,* 474 U.S. 159, 176 (1985), by expanding the category of individuals considered government agents. In *Commonwealth* v. *Hilton,* 443 Mass. 597, 614-615 & n.8 (2005), we held that questioning by a court officer violated the defendant's Sixth Amendment right to counsel and rejected the Commonwealth's argument that the officer was not a government agent. We stated that the *Massiah* line of cases is concerned "not merely with the actions of police themselves, but with 'secret interrogation by investigatory techniques that are the equivalent of direct police investigation.' " *Id.* at 615, quoting *Kuhlmann* v. *Wilson,* 477 U.S. 436, 459 (1986). In *Commonwealth* v. *Howard,* 446 Mass. 563, 563-564, 567, 569 (2006), we held that a social worker investigating for the Department of Social Services was a government agent when she questioned the defendant pursuant to her duties but then forwarded the defendant's responses to a district attorney's office.

In order to give meaning to the government's "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel," *Maine* v. *Moulton, supra* at 171, art. 12 requires us to protect defendants from "informants at large" where, pursuant to *Commonwealth* v. *Reynolds,* 429 Mass. 388, 394 & n.7 (1999), the informant has an articulated agreement with the government that contains a specific benefit or promise, and then trolls the jail for victims. "Any other approach would lend tacit approval to affirmative police interference with the attorney-client relationship. We prefer to view the 'role of the lawyer . . . as an aid to the understanding and protection of constitutional rights,' rather than 'as a nettlesome obstacle to the pursuit of wrongdoers.' " *Commonwealth* v. *Mavredakis, supra* at 860, quoting *Moran* v. *Burbine, supra* at 433 (Stevens, J., dissenting).

Nor are we concerned here with "unnecessarily frustrat[ing]

the public's interest in the investigation of criminal activity," *Maine* v. *Moulton, supra* at 180, that served as a reason the court in *Commonwealth* v. *Rainwater, supra* at 554, declined to find that art. 12 provided more protection for defendants who were questioned concerning uncharged offenses.[12] Moreover, we have already referred to the decisions of other courts that have drawn conclusions similar to ours, albeit pursuant to the Sixth Amendment. See *Creel* v. *Johnson*, 162 F.3d 385 (5th Cir. 1998), cert. denied, 526 U.S. 1148 (1999); *United States* v. *Brink*, 39 F.3d 419 (3d Cir. 1994); *United States* v. *Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980); *Commonwealth* v. *Moose*, 529 Pa. 218, 229 (1992). But see *Commonwealth* v. *Franciscus*, 551 Pa. 376, 394-395 (1998) (violation of both Sixth Amendment and State Constitution to use jailhouse informant's testimony concerning untargeted defendant's statements). Cf. *Commonwealth* v. *Rainwater, supra* at 555 (no other jurisdictions have adopted analysis suggested by defendant).

3. *Deliberate eliciting of defendant's statements.* Having found that the informant was a government agent for purposes of both the Sixth Amendment and art. 12, we now turn to whether the informant deliberately elicited statements from the defendant. *Commonwealth* v. *Reynolds, supra* at 393, citing *Massiah* v. *United States*, 377 U.S. 201, 206 (1964), and *Commonwealth* v. *Harmon*, 410 Mass. 425, 428 (1991).

The judge concluded that even if the informant was a government agent, he did not deliberately elicit incriminating statements from the defendant. As discussed, the judge relied on the informant's written statement to police that he was "shocked" at the defendant's statement that he "licked" the victim. This was error.

In *United States* v. *Henry*, 447 U.S. 264, 274 n.12 (1980), the Court held that a paid informant was a government agent who

---

[12]The United States Supreme Court in *Texas* v. *Cobb*, 532 U.S. 162, 164, 168 n.1, 173 (2001), explicitly rejected the "inextricably intertwined" test for determining whether questioning a defendant who was represented by counsel about other crimes violated the right to counsel that this court indorsed in *Commonwealth* v. *Rainwater*, 425 Mass. 540, 556 (1997), cert. denied, 522 U.S. 1095 (1998).

lured the defendant into making incriminating statements.[13] The Court stated that the informant accomplished this by ingratiating himself through his "conduct and apparent status as a person sharing a common plight." *Id.* at 274. The Court noted that the informant had so ingratiated himself to the defendant that the defendant solicited his aid to escape from jail. *Id.* at 274 n.12. The Court noted that "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Id.* at 274. The government cannot deliberately create a situation designed to induce a defendant to make incriminating statements. *Id.*

In this case, incriminating statements were deliberately elicited. Taken alone, the informant's questioning the defendant about what he did about his anger toward the victim was a deliberate elicitation of the incriminating statement that the defendant "licked" him. The judge relied on the credibility of only a part of the informant's (uncontested) written statement that he was "shocked" to conclude that there was no deliberate elicitation. The judge ignored that part of the statement that put this alleged shock in perspective. He was "shocked," but "*wasn't totally surprised*" because the defendant had a reputation as a shooter and was always threatening people in the jail, saying he would shoot them if "this was the streets." See *Commonwealth* v. *Hilton*, 443 Mass. 597, 604, 613 (2005) (court officer's questions about fire after defendant's spontaneous remarks including statement, "I could have killed my grandchildren," was deliberate elicitation of incriminating statement because officer should have known questions would elicit incriminating response).

However, the informant did more than just ask a direct

---

[13]In *United States* v. *Henry*, 447 U.S. 264, 270 (1980), the Court discussed three factors it considered important in determining whether an agent of the Federal Bureau of Investigation deliberately elicited incriminating statements: (1) the informant was acting under instructions as a paid informant; (2) the informant was ostensibly no more than a fellow inmate; and (3) the defendant was in custody and under indictment at the time he engaged in conversations with the informant. See *United States* v. *Brink*, 39 F.3d 419, 423-424 & n.5 (3d Cir. 1994) (proof of tacit agreement with government officials sufficient for agency and "reward" pursuant to *Henry* case can be offer of reduction in sentence).

question. The defendant did not even speak to the informant until the informant hid a "shank" for him. See note 2, *supra.* Once they began talking, the defendant asked the informant to contact the only eyewitness in the case and ask him not to testify in exchange for "weed." The informant did not pretend to contact the witness and go to authorities. Instead, he actually did contact the witness. It was only after these two incidents that the defendant began discussing the victim and the informant was able to ask the defendant what he did about his anger toward the victim. This was not a case of merely passive listening where, by luck or happenstance, the informant acquired incriminating information about the defendant. *Maine* v. *Moulton*, 474 U.S. 159, 176 (1985), citing *United States* v. *Henry*, *supra* at 276 (Powell, J., concurring). Through his conduct, he created an environment that lured the defendant into a false sense of trust of the kind considered in *United States* v. *Henry*, *supra. Massiah* v. *United States*, 377 U.S. 201 (1964), "not only prohibits direct interrogation of a defendant, but more generally prohibits any 'knowing exploitation by the State of an opportunity to confront the accused without counsel being present.' " *Commonwealth* v. *Howard*, 446 Mass. 563, 568 (2006), quoting *Maine* v. *Moulton, supra.* See *Commonwealth* v. *Hilton, supra* at 614. As the United States Circuit Court of Appeals for the Seventh Circuit observed in *United States* v. *York*, 933 F.2d 1343 (7th Cir. 1991), an informal agreement promising a reward for suitable information makes an informant an agent and the "structure of the deal maximize[s] [the informant's] incentive to cooperate since the strength of the government's support would be a direct function of the assistance he provide[s]." *Id.* at 1358, 1356-1360 (recognizing trolling to be improper; finding that while informant was agent, he did not deliberately elicit statements from defendant).

Once he had the defendant's statement that he "licked" the victim, the informant contacted his attorney within a short period of time. See *United States* v. *York, supra* at 1360 (stating that informant's waiting several months to report what he heard from defendant was evidence that he was telling truth when he said he did not deliberately elicit information). The statements should have been suppressed.

Constitutional errors are presumptively prejudicial and it is incumbent on the Commonwealth to make an affirmative showing that the error was harmless beyond a reasonable doubt. *Commonwealth* v. *Rios*, 412 Mass. 208, 214 & n.8 (1992), and cases cited. The Commonwealth's brief makes no argument concerning whether the error was harmless, and thus it has not made the requisite showing. We note that the only other evidence against the defendant was the testimony of Paul Smith, the only eyewitness, who had contact with Riley before telling the police that the defendant was the shooter. The prejudice was exacerbated by the judge's instruction to the jury that they could consider the defendant's attempt to influence Smith's testimony, which the defendant accomplished using the informant, as evidence of consciousness of guilt. We conclude that a new trial is warranted.[14]

*Conclusion.* For the reasons set forth above, we conclude that under the Sixth Amendment and art. 12, a jailhouse informant who has an agreement containing a specific benefit or promise thereof does not have to target an individual defendant specifically to be an agent of the government. In addition, we conclude

[14]Given our disposition of this case, we need not resolve any of the defendant's other claims and note that posttrial discovery and developments will assist the judge at the defendant's new trial in resolving some of those claims. However, we briefly address one issue that may arise during retrial.

The defendant argues that he was denied a full defense concerning the adequacy of the police investigation of the murder when the judge prevented his counsel from asking one Springfield police officer about other shootings that had occurred shortly before this murder, and did not allow counsel to question a second police officer about the ties between previous shootings and the victim's murder unless the officer connected them in his own investigation.

At the time of the defendant's trial, our decision in *Commonwealth* v. *Reynolds*, 429 Mass. 388 (1999), had just been released. The court held that the substance of tips to police were admissible to show inadequate police investigation where the information was not offered for the truth of the matter but to show that the tips "occurred and were not investigated." *Id.* at 391. In *Commonwealth* v. *Phinney*, 446 Mass. 155, 166 (2006), the court held that a police officer's reports would have been admissible to show that the police were on notice that a third party was a potential suspect, but did nothing to investigate him. Cf. *Commonwealth* v. *Raposa*, 440 Mass. 684, 693-694 (2004) (defendant cannot introduce otherwise inadmissible hearsay in attack on police investigation). We leave it to the trial judge to determine whether evidence the defendant may offer at a new trial is admissible to show inadequate police investigation.

that the jailhouse informant deliberately elicited incriminating statements from the defendant in violation of his right to counsel under the Sixth Amendment and that these statements were not harmless beyond a reasonable doubt. The judgments are reversed, the verdicts set aside, and the cases are remanded to the Superior Court for a new trial.

*So ordered.*