MANSFIELD, Justice
(concurring in part and dissenting in part).
This case can be resolved by common sense, precedent, and basic constitutional principles. A defendant who volunteers incriminating statements to a. fellow in- ’ mate is not deprived of his Sixth Amendment right to counsel just because the *107 fellow inmate has a cooperation clause in his plea agreement and is cooperating with law enforcement. Jail is not a pure, pristine environment Its occupants therefore run the risk that persons with whom they are sharing confidences may be, in common parlance, “snitches.” The State does not violate the Sixth Amendment by taking advantage of this situation so long as the State does not circumvent the right to counsel by using jailhouse stand-ins to question inmates.. The Iowa City Police Department did not do that here or anything close to that. I therefore respectfully dissent in part.
In my view, the court goes well off the tracks in holding that ■ Antonio ■ Martin's testimony should have been suppressed. It appears the Iowa City police had not spoken to Martin at all about the Versypt killing before the defendant1 and Martin discussed it in jail; at most Martin had been asked one general question about it. Furthermore, Martin disclosed to the defendant from the beginning that he was a snitch, and the defendant intentionally sought to use Martin as a snitch to tell his version of Versypt’s death. As a practical matter, the majority finds a constitutional violation only because Martin gave the defendant advice that the defendant’s own counsel would not have given. Unlike the court, I would not recognize this new constitutional claim of “ineffective assistance of fellow inmate.”
The majority opinion, I fear, threatens to harm legitimate law enforcement in Iowa. Under the majority’s approach, anyone who enters into a cooperation agreement with the federal government as part of his or her guilty plea — a fairly common occurrence — becomes a roving agent “at large” of the State of Iowa. If this person then interacts with another inmate, even if the interaction merely results in the inmate writing out what the inmate has already said, a violation of the Sixth Amendment right to counsel has occurred. I am unaware of any court anywhere in the country that has adopted such an expansive view of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[2]
I belieye the court’s conclusions are driven by a fundamentally wrong-headed view of the right to counsel. Undoubtedly, the government has a constitutional obligation not to circumvent defendant’s legal counsdl. And that -does happen in some cases,' although it' clearly didn’t happen here. However, the ’majority’s position is that the State has to make the jail a sanitized environment where every inmate can trust that any fellow inmate who engages him in conversation isn’t cooperating with the government. If the guarantee is violated, any statements can’t be used even if (as in the case of Martin) the defendant knew the fellow inmate was cooperating with the government.
A further flaw in the court’s approach is that it is uttérly unrealistic. Offenders have snitched on one another ever since Adam blamed Eve for giving him the forbidden . fruit. This will continue to occur because the nature of plea bargaining and sentencing (especially federal sentencing) provides a strong incentive for it to occur. The court’s, opinion, however, provides a strong disincentive for the documentation of such arrangements.. Instead of formal cooperation agreements, which provide a clear basis for impeaching the informant while also providing a sanction if the infor *108 mant doesn’t tell the truth, there will be vague and muddy informal arrangements.
I. Additional Factual Background.
A fair understanding of this case needs to begin with more facts than the majority provides. The majority’s quick “overview of the crime” does not adequately convey the strong evidence of Justin Marshall’s guilt.[3] This evidence helps explain why Marshall was not so much a victim of jailhouse snitching as a willing participant, when he sought out others to tell his story in the hope that he would be convicted of a lesser charge than first-degree murder.
Several witnesses placed Marshall in the location where Versypt was killed at the time he was killed. Marshall was also tied to the murder weapon. In addition, gunshot residue was found on Marshall’s jacket. Marshall’s statements to police were highly inconsistent and revealed details about Versypt’s death not known to the public. Marshall later told two fellow inmates — the admissibility of whose testimony is not questioned by the majority — that he had planned to rob Versypt, that Ver-sypt went for the gun or otherwise startled him, that as a result Marshall shot Ver-sypt, and that Marshall then wiped the gun off on his own jacket and ran.
John Versypt’s death from a gunshot wound occurred around 4 p.m. on October 8, 2009. Officers found his body lying on the floor on the back landing of Building C of the Broadway Condominiums. Versypt had been shot once, with the bullet passing at close range through one of his hands and his face. Versypt passed away before the officers arrived. The officers retrieved a multicolored .38 caliber revolver that had been left near Versypt’s body.
Shawnta Jackson lived in a third-floor apartment of Building C. While doing laundry downstairs that afternoon, she had noticed Marshall and another person (Courtney White) standing outside the back door of the building. Later, when Jackson returned to get her laundry, she saw Versypt lying on the ground on the back landing. He was bleeding and gasping for air. Jackson ran back up to her apartment.
Andrew Shepard resided in the same third-floor apartment of Building C as his sister Jackson. After Jackson ran into the apartment telling Shepard in shock what she had seen, Shepard hurried downstairs. Versypt was still breathing heavily, and Shepard saw a gun on the ground. Shepard called the police. While Shepard was on the phone with the 911 operator, Ver-sypt stopped breathing. Shepard also saw a drill, a wallet,- and signs on the floor. The wallet was open.
The next day, Shepard discussed with his brother what he had seen. Marshall joined the pair and asked what kind of gun Shepard had' observed near the body. Shepard said it was a camouflage .38. Marshall admitted to owning “a gun just like that one.” Oddly, though, Marshall claimed to have been in Shepard’s apartment at the time of the shooting. Shepard disputed that, telling Marshall he had not been in Shepard’s apartment. Marshall -insisted he had been in Shepard’s apartment, and Shepard again disagreed.
James Brown lived in Building C in an apartment next door to the apartment where Marshall and Charles Thompson re *109 sided. On the night hefore the shooting, Brown was visiting the other apartment and noticed a dark-colored gun that appeared to be a .38 lying on the bed in the back bedroom. At that time Marshall and Thompson were present in the bedroom. Brown later saw the actual gun that was retrieved from beside Versypt’s body. He identified this as the same gun he had seen the night before the shooting.
Brown’s account of the shooting generally aligned with Shepard’s. Brown heard a shot go off and heard the back door of the building “bust open real quick” but was unable to see anyone exit the building. A few minutes later, Brown could hear Marshall knocking on the door of his own apartment, quietly asking his own aunt (who also resided in the apartment) to let him in. When Brown opened the door qnd looked downstairs, he saw Versypt’s body lying on the landing. Versypt was in the process of dying, and Shepard was on the phone with the 911 operator.
On the evening of the shooting, a surveillance camera caught Marshall and Thompson carrying garbage bags out of Buüding C, which they tossed into the dumpster. However, a jacket that Marshall had been seen wearing during the afternoon of the shooting was later recovered by police. It tested positive for gunshot residue.
Marshall was interviewed by police and made numerous inconsistent statements. His recorded interviews were subsequently played back for the 'jury! Initially Marshall denied knowing anything about the shooting. Later he tried to implicate Thompson, claiming he heard Thompson talking on the phone about “hitting a sweet lick [robbery]” around 2:30 p.m. 'on the day of the fatal shooting. Police were unable to corroborate from phone records that this call had actually occurred.
Later still Marshall said that Thompson and someone else had planned to rob Ver-sypt.' He claimed-he overheard Thompson saying on the. telephone afterward that “we hit a lick,” but the lick “went wrong.” Yet further into the. interview, Marshall-contradicted himself again and. said that these alleged .statements were made during a personal conversation he had with Thompson the night after the shooting.
Marshall also told'police that Versypt had been shot in the face. When asked how he knew this, Marshall became flustered and claimed the police had told him. In fact, the police had deliberately withheld this factual detail.
Thompson was originally charged with Versypt’s murder. However, his trial ended in a mistrial when inadmissible evidence was inadvertently introduced. Subsequently, he reached a deal with the State wherein he pled guilty to being an accessory after the fact.
Thompson ultimately testified against Marshall at Marshall’s trial. According to Thompson’s testimony, right after the shooting, Marshall came into their apartment and said that someone had been shot in the hallway. Later' in the evening, Thompson saw Marshall putting the pants he had been wearing that day in a plastic sack. Marshall then placed the sack in a larger garbage bag from the kitchen. This was one of the bags the two men threw out that evening.
II. The Informants.
On July 12, 2011, a criminal complaint was sworn out against Marshall. Marshall was arrested in Texas - several days, later and transported back to Iowa. On August 1, a trial information, was filed charging Marshall with first-degree murder. Marshall pled not guilty on August 2. He was thereafter held in custody at the Musca-tine County Jail.
*110 Over the course of the Versypt murder investigation* Detective Michael' Smithey interviewed several jailed individuals he thought might have information about the killing. Detective Smithey stated that the focus of such interviews was “[t]o gather information that they have from while they were on the street or that they have gathered while incarcerated.” Detective Smi-they said that, individuals who have been arrested for. “federal-level drug crimes” can be particularly helpful in investigations because they are well known in their communities and can often “shed light on violent crimes, robberies, serious assaults, homicides, [and]' other [crimes].” He continued, “People in , those situations are a wealth of knowledge about what is going on in the street and who is- doing what.” Detective Smithey denied giving any instructions to the persons he interviewed:
[P]eople oftentimes ask, do you want us to find it? No, we’re not .telling you to do anything. If you learn something, contact us, but there are no specific directions as to find something out about this person or ask them this or anything like that,
Three of these informants ended up testifying against Marshall — Carl Johnson, Earl Freeman, and Antonio Martin. The majority concludes that error occurred only with respect to the admission of Martin’s testimony. .Let me therefore review the testimony of the other two informants before I get to Martin.
A. Johnson. Johnson was being held in the Muscatine County Jail during the summer of 2011 following a federal conviction for conspiracy to distribute cocaine. He had entered into a guilty plea that included a cooperation agreement. Johnson had originally been sentenced to 240 months in prison, but after he testified against his codefendant, his sentence was reduced to 140 months.
On July 12, Johnson went through a proffer interview with Detective Smithey and Detective Jennifer Claraban in the presence of Johnson’s attorney. Detective Smithey subsequently- testified regarding the interview as follows:
Q. Now, according to your report, the first thing you told him was we’re ■ here for information about the death of John Versypt or words to that effect, correct? A. May I refer to my report?
Q. Yes. I’m looking at paragraph 2. A. Yes.
Q. Then, on the next page, he was asked to provide information about Charles Thompson, also- known as Weezy. Do you see that there? A. Yes.
Q. Paragraph 4, he was asked to provide information about Justin Marshall. Do you see that?' A. Yes.
Q. ' And then paragraph 5, he was asked to provide information about Courtney White, also known as Mow-Mow. Do you see that? A, Yes.
Q. So, Officer, first you go into Mr. Johnson and you say, we’re here to talk about the killing of John Versypt. Then you give him the names of people you’re interested in, whether it’s [Charles Thompson], Justin Marshall, or Courtney White. Do you recall doing that?
A, Yes. It’s in the report. •
Johnson said he had been a resident of the Broadway Condominiums at the time of the shooting, and he remembered discussing it with other residents when it occurred. During the interview, Johnson told Detective Smithey that Marshall had said Thompson killed Versypt. Detective Smithey did. not ask Johnson to gather any more information from Marshall, Thompson, or White but did tell Johnson to “contact me if he learned anything further,”
In September, Johnson’s attorney contacted Detective Smithey, indicating that *111 Johnson might have additional information about the Versypt killing. Detective Smi-they accordingly reinterviewed Johnson at the jail. Johnson said he had learned more from Marshall after both men had been placed in a segregated area of the jail •in August for separate rule violations. According to Johnson’s trial testimony, their discussion went as follows:
Q. What did( you discuss initially with Justin Marshall. when you first started talking to him while you were in segregation? A. Well, when I first — I say to him then, I knew him so I asked him what was he in there for.
Q. And what did he tell you? A. He say, man, they got me for that landlord, and he cursed.
Q. Did he tell you more about what happened that led him to be charged or did he tell you more about the landlord being shot? A. Both.
' In further conversation, Marshall disclosed to Johnson that he (Marshall) came up with the idea to rob Versypt because “some [tenants] pay with cash.” Marshall also told Johnson that “the robbery went wrong” in that “[t]he landlord got shot.” According to Johnson, Marshall described the shooting in the following terms:
All [Marshall] said was it was real — the shot was loud. It was loud in the hallway, and that kind of like froze him up, and after that he ran out the back to get away from the scene. He came back around, knocking on the front door, but he was whispering a little bit because he didn’t want nobody to know he was in the hallway.
The Iowa City police had made no effort to have either Johnson or Marshall placed in segregation. Detective Smithey also denied asking Johnson to try to' obtain more information or indeed any information from Marshall regarding the killing of Versypt. Detective Clarahan likewise testified that she never asked Johnson to obtain information from Marshall, nor did she ever hear anyone else from the State ask Johnson to get information from Marshall.
B. Freeman.- Freeman was also housed in the same cell block at the Mus-catine County Jail as Marshall for a time period in 2011. At one point, while Freeman was helping Marshall draft a motion for appointment of new counsel, Marshall spoke with Freeman about the reasons why he (Marshall) was in jail. Marshall provided Freeman with this version of whát had happened on October 8, 2009:
[Marshall] went to rob him. [Versypt] grabbed for the gun. The gun went off, shot him in the hand, shot him in the head. He fell in the door or ... on the ground in the doorway ... and [Mar- ' shall] wiped the gun off the front of his jacket and he took off.
Marshall told Freeman that no one else was involved in the attempted robbery and fatal shooting and that Thompson was “innocent.”
Marshall also explained that he wanted to get his charges reduced from murder to manslaughter. He thus discussed a scheme with Freeman under which Freeman would tell his attorney that Marshall had confessed to an accidental shooting. Marshall wrote out on a yellow .pad what he wanted Freeman and another inmate— Martin — to say.'
C. Martin. This brings us to Martin. In -November 2010, Martin was arrested on. federal charges for conspiracy to distribute cocaine and a firearms violation. He pled guilty, and his plea agreement included a cooperation agreement with the federal government in which he agreed to be interviewed by law enforcement and provide truthful information. Martin understood that if he provided substantial *112 assistance in another criminal case to the government and the United States Attorney’s Office filed a motion, the federal district court could reduce his sentence. In fact, when Martin was sentenced on his federal charges in March 2012, Martin received a large reduction in his sentence after testifying against his cousin, a code-fendant in his case.
Although Martin had a cooperation agreement, his discussions with the Iowa City police before October 2011 related to other matters and not the Versypt killing. On cross-examination, Detective Smithey conceded he “may have asked [Martin] if he had any knowledge of it ... but it would have been just a simple, do you know any information about this?” At this point, Martin’s answer obviously would have been no.[4]
Between his arrest in November 2010 and his sentencing in March 2012, Martin was also being held at the Muscatine County Jail. Martin previously knew Marshall from the Broadway neighborhood, yet had not seen him since 2009. In August 2011, Martin ran into Marshall when he was moved into Marshall’s sixteen-man pod. There is no evidence that the State deliberately placed the men together or that Martin sought out Marshall’s pod.
In their initial conversations, Marshall told Martin that he was in jail for the murder of Versypt but denied having anything to do with it. Martin in turn told Marshall what his federal charges were and that he was testifying against one of his codefendants. In other words, Marshall knew that Martin was a “snitch.” In fact, Marshall intended to use Martin for that purpose.
As time passed, Marshall stopped claiming that he had nothing to do with Ver-sypt’s death. Instead, Marshall related to Martin a different story — that Versypt had startled Marshall, Marshall’s gun had accidentally gone off, and then Marshall had wiped the gun off and run away. As Martin testified,
Q. [D]id he tell you what happened when he went out to sell the gun? A. He said he went downstairs and somebody came up behind him saying something, coming, approaching him, and he got scared and he turned around and pulled the gun from his waistband.
Q. Did he tell you what he did with the gun? A. He said it all happened so quick, you know. The gun went off and he dropped it and picked it back up and wiped it off and dropped it again and ran.
Marshall also told Martin he was trying to get his charge reduced to manslaughter and asked Martin for information on the legal definition of manslaughter as well as armed robbery. At this point, Martin encouraged Marshall to write his story down, i.e., to “use [Martin] as a jailhouse snitch” so Martin could “get [Marshall’s] story out and it might help both of [them].” Marshall did his writing on a legal pad provided by Marshall’s attorney. Martin was not present when Marshall wrote out his account and never told Marshall what to write.
In October 2011, Martin was telephoning with his own attorney at the Muscatine County Jail and took Marshall’s handwritten story with him. It turned out that Detective Smithey was there that day as *113 well on another matter. Neither Martin nor Detective Smithey knew the other was going to be present. When Detective Smi-they came into the room, Martin showed him the legal pad and let him scan it but didn’t let him keep it. Detective Smithey then obtained a search warrant for Marshall’s cell. Marshall’s handwritten story, by then torn into pieces that , had to be reassembled, was recovered from Marshall’s jail cell. It was identified by both Freeman and Martin and used against Marshall at trial.
The majority says it is a “remarkable coinciden[ce]” that Detective Smithey was at the jail the day that Martin was talking on the phone with his attorney. I do not find this remarkable. In 2011, Detective Smithey had been reassigned to the Johnson County Drug Task Force and thus had numerous other reasons to be at the'jail. Here is Detective Smithey’s testimony that the majority finds unbelievable and that I do not:
Q. How did it come about that you interviewed him that day? A. I had just finished having a conversation with someone else there at the jail. There are two areas where these conversations typically take place. One is the library. It’s a fairly sizable room with law books, and I don’t know if it’s technically a law library there or not, but there’s fairly— it’s where most of the meetings take place because there are multiple tables in it where five, six, ten people could probably sit. And then there’s another room that is between the library and the door that is used to exit the secure area of the facility. As I was leaving the library area, I saw Antonio Martin sitting alone inside that other much smaller room. It’s a room that four people would be uncomfortable being in. It’s tight. He was alone in that room. And I confirmed with jail staff that it was indeed Mr. Martin in the room.
Q. And what did you do when you saw Mr. Martin? A.. I asked the jail staff if they’d allow[] me in to speak with him, and they did. I went into the room, and he was on the phone with his attorney at the .time. I identified myself to her. I knew her from other cases that I was working, and they allowed me to sit in and ask a few questions of Mr. Martin. -
Q. While you were sitting in -with Mr. Martin, did Mr. Martin show you anything? A. He did.
Q. And could you just generally describe what he showed you. A. Mr. Martin showed me a yellow legal pad. That legal pad had — it wasn’t 'completely full. It had four pages. The first four pages had writing on them. Thé others were blank.
. .The district court found that Martin “collected information prior to and without being approached by the police.” Unlike the majority, I would not disbelieve Detective Smithey but would rely on the trial judge’s evaluation of what happened here,
D. The District Court’s Ruling. The district court overruled Marshall’s motion to suppress the testimony of Freeman, Martin, and Johnson on the following grounds:
I have had a chance to review the standard, and I’m going to.overrule the inotion to suppress and allow the witnesses to testify. The case law suggests that an informant becomes a government agent for purposes of the test only when the informant has been instructed by the police to get information about a particular defendant. The defendant must demonstrate that the police and their informant took some action beyond merely listening that was designed deliberately to elicit incriminating 'remarks.
*114 ... The primary — the cases indicate that the primary concern of those decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. The Sixth Amendment is not violated, however, whenever, by luck or happenstance, the State ■ obtains incriminating statements. I think this case presents just the sort of luck or happenstance that resulted in these gentlemen coming forward and providing information to the State based upon what they alleged to have been statements made by Mr. Marshall.
I think this analysis succinctly summarizes why there was no Sixth Amendment violation here.
III. Marshall’s Sixth Amendment Right to Counsel Was Not Violated Because Martin Was Not a Government Agent When He Spdke to Marshall.
'In Massiah, the United States Supreme Court held that á defendant
■ was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in . the absence of his counsel.
377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250. Thus, a Massiah violation requires findings that the informant was a government “agent” and “had deliberately ■ elicited” statements from the defendant. Id. Both of those elements are simply absent here. I will start with agency. Marshall bears the burden of proof in establishing agency. See Moore v. United States, 178 F.3d 994, 997, 999 (8th Cir.1999); Lightbourne v. Dugger, 829 E.2d 1012,1020 (11th Cir.1987).
I agree with the essence of the State’s position: Without some direction or instruction from the government, an informant does not become a government agent for Massiah purposes. The most one can say here is that Martin had entered into a plea agreement on federal charges wherein he agreed to cooperate with the government in the hope of receiving a sentence reduction and that Martin and Marshall ended up in the same jail pod. These routine circumstances fall well short of establishing agency.
It is important to note what this case does not involve. There is no evidence that Martin was asked to contact Marshall or engage him in conversation. There is no evidence that any person with knowledge of Martin’s status placed him in the same unit with Marshall (or even knew they were going to be together). There is also no evidence that Martin sought out Marshall.
Since Massiah, three other Supreme Court decisions have specifically addressed the government use of informants to allegedly circumvent ■ thé Sixth Amendment right to counsel. See Kuhlmann v. Wilson, 477 U.S. 436, 456, 106 S.Ct. 2616, 2628, 91 L.Ed.2d 364, 382-83 (1986); Maine v. Moulton, 474 U.S. 159, 171, 106 S.Ct. 477, 484, 88 L.Ed.2d 481, 492-93 (1985); United States v. Henry, 447 U.S. 264, 269, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115,121 (1980).
No one disputes that Henry is the high-water mark for the Supreme Court’s recognition of claims of Massiah violations. In Henry, FBI agents reached out to Nichols, a paid informant, who was being held in the same jail as Henry. Henry, 447 U.S. at 266, 100 S.Ct. at 2184, 65 L.Ed.2d at 119. Henry had been indicted for armed robbery, and the facts were not clear whether the government contacted *115 Nichols for information about the robbery-more generally or asked for information specifically about Henry.. Id. Nichols told the agents that he was on the same cell-block as several federal prisoners including Henry, and “[t]he agent told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery.” Id. at 266,100 S.Ct. at 2184-85, 65 L.Ed.2d at 119. After Nichols’ release from jail, the same FBI agent contacted him, and Nichols gave the agent information that Henry had revealed to Nichols in conversation. Id. at 266, 100 S.Ct. at 2185, 65 L.Ed.2d at 119. The government paid Nichols for the information. Id. Nichols testified at Henry’s trial, and Henry was convicted. Id. at 267, 100 S.Ct. at 2185, 65 L.Ed.2d at 120.
Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing ' Henry’s suspicion. The arrangement between Nichols -and the agent was on a contingent-fee basis; Nichols was to be paid only if he produced useful information.
Id. at 270,100 S.Ct. at 2187, 65 L.Ed.2d at 122.
In its opinion, the Court concluded, “By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry’s Sixth Amendment right to counsel.”. Id. at 274, 100 S.Ct. at 2189, 65 L.Ed.2d at 125. The Court added, “Even if the agent’s state-’ ment that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result.” Id. at 271, 100 S.Ct. at 2187, 65 L.Ed.2d at 122. Otherwise stated, the Court found that Nichols was “acting by prearrangement as a Government agent.” Id. at 273, 100 S.Ct. at 2188, 65 L.Ed.2d at 124.
We applied Henry not long after it was decided in State v. Nelson, 325 N.W.2d 118, 120 (Iowa 1982). In that case, Jackson, an informant, passed a note to a jailer stating that he had information regarding Nelson’s case that he wanted to discuss with law enforcement. Id. at 119. The informant met -with a deputy sheriff and passed, along incriminating statements niade by Nelson in jail. Id. The deputy sheriff told the informant that he would put. him in touch with the. officers investigating Nelson’s ease. Id. The deputy “made no promise to Jackson in return for the information,” and “he did not direct Jackson to endeavor to gather any further information.” Id. Rather, “[h]e merely had Jackson return to his cel to continue in the same capacity as an inmate.” Id. The deputy “obviously knew further conversations were likely.” Id. Still we reasoned that “[t]he crux is that the State had not ‘put him [the informant] up to it.’ ” Id. After this first meeting, Jackson later met with law enforcement again and agreed to work for the state; on other cases. Id.
We affirmed the trial court’s ruing that only státements .made by Nelson after Jackson’s second meeting with law enforcement should be suppressed whereas statements made after the first meeting were admissible. Id. at 120. With respect to the first meeting, we noted both that the state had riot directed Jackson to’ gather more information and that Jackson had no agreement with the state that he would receive payment or other favorable treatment for providing the information. Id. at 119-20. “In summary we do not beleve the statements which were the subject of Jackson’s testimony were gathered by him *116 at the time he was working for the State.” Id.
This case falls short of the circumstances warranting suppression that were described in either Henry or Nelson. At most, prior to Martin’s encounter with Marshall, Detective Smithey might have asked Martin a simple question as to whether Martin had any information about the Versypt killing. Again, there is no evidence the Iowa City Police Department knew Martin was going to be housed with Marshall, made arrangements for this to happen, told Martin to listen for statements by Marshall, or even expressed particular interest in the Versypt killing.[5]
The majority places great weight, apparently dispositive weight, upon Martin’s federal cooperation agreement. Although Martin’s plea bargain is not in the record, there is no indication that it included anything other than a typical, plain vanilla federal cooperation agreement. Under such an agreement, the defendant agrees to meet with the government and provide truthful information about criminal activity of which he or she is aware, and the government agrees to move for a downward sentencing departure if the defendant ends up providing substantial assistance to the government. See, e.g., United States v. Cimino, 381 F.3d 124, 125 n. 1 (2d Cir.2004); United States v. Tejada, 773 F.Supp. 622, 624 (S.D.N.Y.1991).
So, the question becomes, in effect, if an individual enters into a standard cooperation agreement, does that individual become a government agent with respect to any matters in which the government happens to have interest?
A number of federal circuits would say no under their bright-line approach. They hold that a cooperation agreement is not enough unless the informant is “instructed by the police to get information about the particular defendant.” United States v. Whitten, 610 F.3d 168, 193 (2d Cir.2010) (quoting United States v. Birbal, 113 F.3d 342, 346 (2d Cir.1997)); see United States v. LaBare, 191 F.3d 60, 65-66 (1st Cir. 1999); Moore, 178 F.3d at 999. Clearly that did not occur here.
The majority is correct that many circuits do not follow the bright-line approach. But when one reviews the facts and holdings of these cases, none of them are helpful to Marshall.
Thus, the Third Circuit has found that a combination of an informant’s “tacit agreement with the government” to receive potentially favorable sentencing treatment and the government’s deliberate placing of the informant in a cell with another inmate to obtain information from the inmate could amount to a Massiah violation. United States v. Brink, 39 F.3d 419, 424 (3d Cir.1994). The Fourth Circuit requires that “the prosecutors have intentionally placed the informant in the jail cell with instructions to elicit a confession, or ... there has been an agreement promising consideration for a confession from a. particular defendant.” United States v. McFadden, 187 Fed.Appx. 290, 294 (4th Cir.2006). The Fifth Circuit has approved a test for agency under which the informant must have “acted pursuant to instructions from the State, or otherwise submitted to the State’s control.” Creel v. *117 Johnson, 162 F.3d 385, 393 (5th Cir.1998). Similarly, the Seventh Circuit has refused to find a Massiah violation when “[t]he evidence demonstrated no government control over [the informant’s] actions; most importantly, there was no control over [the informant’s] decision to arrange a meeting with [the defendant],” United States v. Li, 55 F.3d 325, 328 (7th Cir.1995). The Ninth Circuit has held that a Massiah violation can occur when the informant is intentionally “put back in the cell with [the defendant]” after meeting with law enforcement and indicating a “willingness to cooperate with the prosecution” even without a promise of leniency. Randolph v. California, 380 F.3d 1133, 1146-47 (9th Cir.2004). Meanwhile, the D.C. Circuit rejected a Sixth Amendment claim' when the informant “was acting as an entrepreneur” and the government had not encouraged or instructed him to speak with the defendant in jail. United States v. Watson, 894 F.2d 1345, 1348 (D.C.Cir. 1990).
As can be seen, the nonbright-line circuits are not uniform in their approaches. However, under any of these standards Marshall has failed to establish that Martin was acting as a government agent. Martin had received no instructions from the State, and his encounters with Marshall in the same segregation unit of the jail were pure happenstance.
The majority attempts to use United States v. York, to support its “informant at large” theory.' See York, 933 F.2d 1343 (7th Cir.1991), overruled on other grounds by Wilson v. Williams, 182 F.3d 562, 567 (7th Cir.1999). The case is easily distinguishable. In that case, the informant had a .longstanding relationship with the FBI and was reporting to the FBI on a weekly basis and making monitored phone calls on the FBI’s behalf. Id. at .1357-58. After giving the information to the FBI that was used against the. defendant, he received $5000 from the FBI. Id. at 1358. Additionally, the FBI agent “told [the informant] the type of information he was interested in receiving; that statement was tantamount to an invitation to [the informant] to go out and look for that type of information.” Id. In dicta, the Seventh Circuit concluded that an agency relationship existed between the FBI and. the informant, although it ultimately found there had been no, deliberate elicitation and therefpre no Massiah violation. Id. at 1358-60.
The Seventh ■ Circuit’s test .for agency was based on traditional common law agency principles, and under the egregious facts of York the- Seventh Circuit said that the informant served as an agent 'Subject to the government’s control. See id. at 1357-58. However, it is noteworthy that the court today disclaims a common law agency test. -It is also noteworthy that more recently, the Seventh Circuit -declined to find agency when the informant discussed with the government his plan to meet with the defendant, but there was no government control over the informant’s actions or his decision to arrange a meeting with the defendant. See Li, 55 F.3d at 328. . .
Another inform'ant-at-large case, Commonwealth v. Moose, is also factually distinguishable from what occurred here. See 529 Pa. 218, 602 A.2d 1265 (1992). In that case, the informant had been intentionally “kept in the county jail for three years because he was supplying the district attorney’s office with information about various inmates.” Id. at 1270. In fact, this informant “was called the ‘monsignor’ because so many inmates allegedly confessed to him.” Id. The Pennsylvania Supreme Court concluded that even though the informant “was not planted for the purpose of gaining information from a *118 targeted defendant,” “[t]he fact that the Commonwealth Intentionally left him there to harvest information from anyone charged with a crime and awaiting trial is the villainy.” Id. Again, these extreme facts that supported a finding of agency bear no. resemblance to the record here.
The majority also cites Ayers v. Hudson, 623 F.3d 301, 312 (6th Cir.2010), to support its view "that “a wink and a nod” can establish agency, The Sixth Circuit disavows the bright-line approach. Id. at 311. (“We agree with those courts that do not limit agency in the Massiah context to cases where the State gave the informant instructions to obtain evidence from a defendant”)- Yet: once again, the facts of the case cited by the majority are quite different from here. In Ayers) the defendant confessed to- an informant sharing his jail pod that he had Committed a murder. Id. at 305. The informant Contacted the police and met -with detectives to relay this information, Jd. At that time, the informant could not provide the detectives with information about the murder weapon or money stolen from the victim. Id. The detectives’ report specifically noted, this information was missing. Id. The detectives returned , the informant-to the jail pod and “within an hour or so” thereafter, the informant directly questioned the defendant regarding the murder weapon and the stolen money,. Id. at 306-06. The Sixth Circuit suppressed the statements regarding the weapon and the money that the informant had obtained from the defendant within an hour after meeting with the detectives. Id. at 310.
By contrast, in the present case, the State did not intentionally place Martin in proximity to Marshall so he could procure additional information. Moreover, the record in Ayers strongly suggested the informant. had been given specific guidance by the police, considering that he immediately sought out the two pieces of information the detectives wanted. See id. at 305. No such guidance was given to Martin.
The only appellate decision I am aware of that might help Marshall establish agency under the facts of this case comes from the Massachusetts Supreme Judicial Court. See Commonwealth v. Murphy, 448 Mass. 452, 862 N.E.2d 30 (2007). Murphy was found guilty of murder following a trial at which an informant testified to statements Murphy made in jail. Id. at 34-35. The informant had entered into a plea agreement with the United States Attorney’s Office and subsequently met Murphy in jail. Id. at 34. Under the terms of the plea agreement, “if the informant provided ‘substantial assistance’ to the government, in the discretion of the United States Attorney’s office,” the informant could potentially receive a lesser sentence. Id. at 36. The informant did not have any agreement with any Massachusetts authorities. Id. at 35. The informant did two favors for Murphy to lure him into a false sense of trust, before asking Murphy what he did about his anger toward the victim. Id. at 44-45. The court concluded that the informant had acted as a government agent and found a violation of both the Sixth Amendment and its counterpart in the Massachusetts Constitution. = Id. at 46. The court explained,
[Wjhere the government has entered into an “articulated agreement containing a specific benefit,” or promise thereof, the recipient inmate is a government agent for purposes of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights even if the inmate is not directed to target a specific individual.
id. at 33 (quoting Commonwealth v. Reynolds, 429 Mass. 388, 708 N.E.2d 658, 664 (1999))..
*119 I do not agree with this decision, which essentially holds that a generic cooperation agreement is enough to confer government agent status on an individual. See Whit-ten, 610 F.3d at 193 (“Mdre than a cooperation agreement is required to make an informant a government agent with regard to a particular defendant.”). Generally, of course, the mere existence- of an agreement containing a quid pro quo does not make one party the agent of the- other. Contract law teaches us that all enforceable agreements have a quid pro quo, but that does not mean the parties become agents of each other. See Restatement (Third) of Agency § 1.01 cmt. c, at 19 (Am. Law Inst.2006) (“Not all. relationships in which one person provides- services to another satisfy the definition of agency.”). There must be some element of control, based on an actual instruction to target a specific defendant, as several circuits hold, or some other form of supervision, such as intentionally placing the informant directly with the defendant in order to obtain information from the defendant. Even foreseeability that the informant would engage with the defendant, which we do not have here, was not enough according to our Nelson decision. See Nelson, 325 N.W.2d at 119-20 (finding the informant was not “working for the State” because the State “had hot ‘put him "up to it’ ” even though the State “obviously knew further cbnver-sations' were likely”). Here there is simply no indication that Detective' Smithey directed or controlled Martin’s activities.
My colleagues do not approve of a direction-or-control requirement. But the law as established by the United States Supreme Court requires that the informant be a government “agent.” See Massiah, 377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250. And to be an agent one must agree to act on a principal’s behalf and be subject to the principal’s control. See Restatement (Third) of Agency ‘§ 1.01, at 17. So, a control element focuses the inquiry where it should be focused.
By resorting to circular reasoning, the court leaves a hole in its' analysis. The majority states, “[A]' court must determine — under all thé facts and circumstances — whether the relationship between the state and an informant is such that the state has violated its affirmative duty ... to protect the Sixth Amendment rights of defendants.1” This circular standard is no standard at all.' Rather, it simply restates the ultimate issue — i.e., whether the Sixth Amendment has been violated.
Given this circularity, we need to consider what as a practical matter the court relies on to .find agency here. , As in Murphy, it is merely the existence of a generic cooperation agreement between Martin and the federal government.
Given the nature of federal sentencing, federal defendants are often motivated to inform on other inmates with or without a cooperation agreement. See 18 U.S.C. § 3553(e) (2012) (“Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant’s substantial assistance in the investigation or prosecution of another person who has committed an offense”). -
“Entrepreneurs and volunteers are' not government -agents.”- United States v. Johnson, 338 F.3d 918, 924 (8th Cir.2003). Marshall fell prey -to the self-interest of other inmates, hot government interference with his right to counsel. This is clearly not a case where the government acted “to circumvent the right'to the assistance of counsel.” Moulton, 474 U.S. at 176, 106 S.Ct. at 487, 88 L.Ed.2d at 496. Because Martin was not acting as a government agent, ■ Marshall’s Sixth Amendment rights were not violated.
*120 IY. Martin Did Not Deliberately Elicit Statements from Marshall.
Marshall’s Massiah claim also fails because Martin did not deliberately elicit statements from him. The Supreme Court has explained the reasoning behind this prong of the inquiry:
[T]he primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since “the Sixth Amendment is not violated whenever — by luck or happenstance — the State obtains incriminating statements from the accused after the right to counsel has attached,” a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.
Kuhlmann, 477 U.S. at 459, 106 S.Ct. at 2680, 91 L.Ed.2d at 884-85 (quoting Moulton, 474 U.S. at 176, 106 S.Ct. at 487, 88 L.Ed.2d at 496). It should be noted that the burden of proving deliberate elicitation, like agency, rests with the defendant. See id. (“[T]he defendant must demonstrate _”).
Justice Powell’s concurrence in Henry makes clear that “the Sixth Amendment is not violated when a passive listening device collects, but does not induce, incriminating comments” and that “the mere presence of jailhouse informant who had been instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional.” Henry, 447 U.S. at 276, 100 S.Ct. at 2190, 65 L.Ed.2d at 126 (Powell, J., concurring). It is Justice Powell’s concurrence that the Supreme Court cited and relied on in Kuhlmann and Moulton when it clarified the deliberate-elicitation element. See Kuhlmann, 477 U.S. at 459, 106 S.Ct. at 2629-30, 91 L.Ed.2d at 384; Moulton, 474 U.S. at 176, 106 S.Ct. at 487, 88 L.Ed.2d at 496.
Before I get to Martin, I would like to briefly comment on Johnson. The court concedes only grudgingly that Johnson did not deliberately elicit incriminating information from Marshall. In fact, the only question that Johnson asked Marshall was the classic icebreaker: What are you in for? As Johnson testified, “I knew [Marshall] so I asked him what was he in there for.” Kuhlmann makes clear that establishing deliberate elicitation requires more. See 477 U.S. at 459, 106 S.Ct. at 2629-30, 91 L.Ed.2d at 384 (condemning techniques that are “the equivalent of direct police interrogation”). Asking one question of such a generic nature does not amount to the functional equivalent of interrogation. See United States v. Rosa, 11 F.3d 315, 330 (2d Cir.1993) (finding that a witness who ran into the defendant unexpectedly in jail and asked the defendant why he was there did not try to solicit information). The trial testimony reveals that Marshall initiated the more detailed discussions about the shooting of Versypt. As Johnson testified,
Q.And he just happened to start suddenly talking to you about his case? A. He didn’t just start talking to me over just a couple days. He started talking to me, yes.
[[Image here]]
Q. And only when you’re alone in segregation does he suddenly open up to you, correct? A. Yeah. He told me about it a little bit, yeah.
There is no evidence that Johnson asked Marshall any additional questions or even made suggestive comments when Marshall *121 was describing to him the circumstances of Versypt’s death.
This should end any need to discuss Johnson further, but the court goes on. In particular, it indicates that Marshall’s trial counsel may have been ineffective, that counsel’s supposed failure to cross-examine Johnson on the subject of elicitation was “remarkable,” and that counsel may not have been aware of the deliberate-elicitation requirement. Although I agree with the court’s ultimate resolution of the Massiah claim regarding Johnson, these innuendoes are unfair. The questions and answers quoted above come from defense counsel’s cross-examination of Johnson. The deliberate-elicitation requirement had just been discussed at some length when the court ruled on the motion to suppress the previous afternoon.[6]
Courts addressing Massiah claims with facts like these have found that no deliberate elicitation occurred. See, e.g., United States v. Jacques, 684 F.3d 324, 330-32 (2d Cir.2012) (holding that no violation of the right to counsel occurred when a friend of the defendant cooperated with the FBI in speaking to the defendant through a series of monitored phone calls and the friend asked no more than a few questions that were not of “a probing nature”); Whitten, 610 F,3d at 192-94 (denying Sixth Amendment claim when the defendant volunteered incriminating information during conversation that the defendant initiated); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 895-96 (3d Cir.1999) (finding no deliberate elicitation when the defendant had reached out to informant and the informant had largely just listened, asking only “a few clarifying questions”); Lightbourne, 829 F.2d at 1021 (finding that an alleged Sixth Amendment violation was not supported by sufficient evidence where the informant “took no actions to stimulate the incriminating remarks”); Wallace v. Price, 265 F.Supp.2d 545, 569 (W.D.Pa.2003) (noting there was “no evidence that [the informant] initiated the conversation with [the defendant]” and upholding magistrate’s ruling that the defendant had failed to direct the court to any evidence that the informant deliberately elicited statements).
Turning to Martin, the court today says “there is no doubt that he deliberately elicited incriminating statements from Marshall.” I disagree. Events happened *122 in the following sequence. First, 'Marshall denied involvement in the Versypt killing to Martin. Then, over time, Marshall “started switching his story up,” according to Martin. Marshall told Martin he had a gun with which-he shot Versypt when Ver-sypt startled him. Marshall added that he had wiped off the gun and run away, At that point, Marshall asked Martin for advice on manslaughter. Martin researched manslaughter for Marshall and reported back. Only then did Martin recommend that Marshall write down his. “side of the story .... to get a lesser charge.” Marshall provided his written, statement with the mutual understanding and plan that this statement would be passed along to law enforcement:
, Q. When you were speaking with your attorney and to Officer Smithey, did you think that you were helping Justin Marshall? A. Yes. ,
Q, Did you believe that you were doing what Mr. Marshall had asked, you to do? A. Yes.
Viewing the entire sequence of events, Martin did not engage in deliberate elicitation. Marshall voluntarily told Martin what had happened and asked for Martin’s legal advice on getting a lesser charge. Thereupon Martin advised Marshall to write down his story so Martin could deliver it to Martin’s attorney and from there to law enforcement. This was poor advice, but it wasn’t deliberate elicitation. 'This case to some extent resembles United States v. Booker, where the defendant “voluntarily- approached Blickley and sought his assistance researching-certain legal issues relating to this, case.” No. 05-313(JBS), 2006 WL 242509, at *8,(D.N.J. Feb. 2, 2006). As the court.described in that case:
[T]he entire purpose of Booker’s re- , quest was to enlist Blickley’s help.
[T]hat task necessarily required Booker ' to furnish Blickley with details about his case. Moi-eover, Blickley actually furnished advice to Booker, based on research, regarding suppression of evidence- in this case and legal issues in other matters, and Blickley drafted a memorandum for Booker that led to the dismissal of unrelated bank robbery charges against Booker under the Speedy Trial Act, according to Blickley’s testimony. It is understandable that a lot of talking transpired between Blick-ley and Booker in January given the range of legal assistance Booker was seeking from Blickley. That Blickley may. have asked certain clarifying questions of Booker during their many conversations, or that Blickley told Booker to be completely truthful, does not alter the voluntariness- of Booker’s disclosures. .

Id.

Moreover, in this case, Marshall knew Martin would be passing along his written statement to law enforcement. Thus, concerns about an “undisclosed undercover informant” and “surreptitious interrogations” were simply absent here. Henry, 447 U.S. at 273, 100 S.Ct. at 2188, 65 L.Ed.2d at 123-24; Massiah, 377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250. Again, as the Supreme Court put it in Kuhlmann, “[T]he primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation,”. Kuhlmann, ATI U.S. at 459, 106 S.Ct. at 2630, 91 L.Ed.2d at 384. In Kuhl-mann, an undisclosed informant commented to the defendant that his initial version of what happened “didn’t too sound too good”; a few days later, the defendant made incriminating statements. Id. at 439-40,106 S.Ct. at 2619-20, 91 L.Ed.2d at 372. Yet, considering the entire “interaction,” the Court found that no deliberate
*123 elicitation had occurred. Id. at 460, 106 S.Ct. at 2630, 91 L.Ed.2d at 385. Looking at the entire interaction here, I think this is an easier case than Kuhlmann: There was nothing “secret” here. Martin was open about what he was doing and advised Marshall to write down his story only after Marshall had given Martin the same story orally and asked for Martin’s legal advice.
V. Conclusion.
For the reasons stated, I would affirm Marshall’s conviction and the well-reasoned suppression ruling of the district court.
. WATERMAN and ZAGER, JJ., join this concurrence in part and dissent in part.

. I discuss below the cases that the court claims support its approach. There is a Massachusetts case that adopts the majority’s view of agency but requires more by way of deliberate elicitation than the majority' does today, See Commonwealth v. Murphy, 448 Mass. 452, 862N.E.2d 30, 43-45 (2007).

. The district court found there was substantial evidence to support guilty verdicts on all . of the theories presented to the jury, including that Marshall committed murder as a principal, that Marshall engaged in joint criminal conduct (i.e., he intentionally joined a robbery during the course of which Versypt was murdered), and that Marshall committed felony murder (the felony being robbery). I agree.

. Martin himself did not recall ever meeting Detective Smithey prior to October 2011. Regardless, Detective Smithey's testimony that he "may have” asked Martin in passing about the Versypt killing does not demonstrate that Detective Smithey asked Martin to gather information on that killing, let alone that Detective Smithey asked Martin to get information on Marshall.

. The majority points to testimony given by Detective Smithey on cross-examination that it would “[plrobably” be "reasonable to assume” that after the July 2011 meeting, Johnson was "going to tell other snitches” that the government wants to know about the Versypt killing and the people the government was interested in. However, Martin denied discussing Marshall with Johnson, and Johnson likewise denied discussing Marshall with Martin. Moreover, the three individuals who were persons of interest in the Versypt killing — Marshall, Thompson, and White — were already widely known to the general public.

. Obviously, cross-examination is more an art than a science. Defense lawyers need to weigh the downside of bringing out or reinforcing that which harms their clients against the upside of bringing out or reinforcing that which helps their clients. We were not on the scene making these difficult decisions in real time.
For related reasons, I do not see the relevance of United States v. Pannell, 510 F.Supp.2d 185 (E.D.N.Y.2007). In that case, the district court made a specific finding based on its own observations that the informant was not credible:
Miller testified that he never asked Pan-nell any questions about his case and that Pannell volunteered the information during lengthy conversations about general, everyday matters. Having carefully observed Miller, his testimony that Pannell volunteered detailed incriminating information— as memorialized in Miller’s notes — without any prompting or encouragement from Miller cannot be credited.... Miller was evasive and gave conclusory answers when questioned as to how Pannell had provided such painstakingly detailed information about his involvement in the post office robbery, repeatedly saying, "we conversat-ed.” Indeed, Miller would not acknowledge that, in the course of their conversations, even on everyday matters, he had ever asked Pannell a single question. I therefore discredit Miller’s testimony that he never asked Pannell any questions about his case nor encouraged him to speak of it.
Id. at 192, In contrast, the district court here made no such finding. And unlike the trial judge, we did not have the opportunity to see and hear the witnesses.